UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| THOMAS BRUCE | * | CIVIL ACTION NO. |
| VERSUS | * | 2:17-cv-03940-JTM-JCW |
| ANCRA INTERNATIONAL, LLC | * |  |

*******************************************

MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE TESTIMONY OF MARSHAL CLARK

MAY IT PLEASE THE COURT:

This is a motion to exclude the testimony of Marshal Clark, tendered as an expert by defendant.

Background

This is a products liability case arising out of severe injuries suffered by Thomas Bruce when a winch bar, manufactured in China and acquired and labeled as its product by defendant, Ancra International, LLC (hereinafter "Ancra"), failed during foreseeable use. Defendant has offered as an expert witness Marshal Clark, a self-described forensic engineer, who examined the failed winch bar ("the Subject Bar") and rendered an opinion. Because that opinion lacks even the most basic factual underpinnings, relies on improper methodology, and is based on supposition, unfounded speculation, and outright guesswork, (for instance, Clark admitted that he does not even know the working load limit of the bar despite his conclusion that the bar failed due to overloading), his testimony fails to meet the standards of reliability mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), Clark's testimony should be excluded by this Court.

Factual Background

Below is a photograph of an exemplar bar of the type that broke and injured Mr. Bruce.



The slanted end of the bar is commonly referred to as the "tip end" and the other end of the bar is referred to as the "box end." Below the photograph of the exemplar is a photograph of the broken tip of the bar.



The markings on the Subject Bar indicate that it was manufactured some time in 2013. It is not clear when the bar was put into service. The accident occurred on May 30, 2016.

On the date of the accident Mr. Bruce, who was an employee of Dufrene Building Materials, was using the Subject Bar to tighten straps around building materials that were to be transported for delivery on a flatbed truck. While he was using the Subject Bar, the tip of the bar sheared off, and the bar forcefully struck Mr. Bruce, hitting his shoulder and causing him to fall and further injure his knee, shoulder, and back. The Subject Bar was fabricated in China by, according to the invoice provided by Ancra, Eminent Palace International Limited. (Clark's report contradictorily lists the Chinese fabricator as Asian International.) The bars were shipped from China directly to Ancra and, according to Clark, Ancra did no testing after the bar was received from China other than an eyeball inspection to see that they had received the right bars. (Exhibit A, Clark Deposition, pp. 30-31)

Plaintiff's expert, Dr. Joseph Parse, a member of the academic staff of Massachusetts Institute of Technology, examined the Subject Bar using MIT's state-of-the-art scanning electron microscope. Based upon his examination, Dr. Parse concluded that the winch bar failed as the result of pre-existing cracking in what is known as the Heat Affected Zone, the place where the bar tip was welded to the tubular handle. (Exhibit B, Parse Summary of Conclusions) Dr. Parse opined that the cracking in the Heat Affected Zone is a welding defect and was not an intended feature of this product or its design – in other words, the bar failed due to a manufacturing defect. Dr. Parse also noted that the crack would not have been obvious. The fact that the break occurred at the site of the weld that affixed the tip to the shaft of the bar provides a common-

sense buttress to the conclusions that Dr. Parse reached as a result of scanning electron microscopy and other inspections.

Dr. Clark reached different conclusions as opposed to scientifically supported opinions within his field of expertise:

> The failure of Mr. Bruce's winch bar was the result of the user failing to follow the manufacturer's instructions regarding proper use of the bar, or to perform the manufacturer's recommended inspections.
>
> Failure of the subject winch bar was the due to low cycle fatigue resulting from the repetitive application of excessive forces. The fatigue crack propagated more than halfway across the solid tip section of the bar, until a critical flaw size for the applied load was reached. Once the critical flaw size was reached, the remaining cross section (approximately 20 percent) failed in fast fracture.

Dr. Clark also states:

> During proper use of the winch bar (i.e., with the user's feet on the ground), the maximum downward force that can be applied to the bar is essentially the user's body weight without the user being lifted from the ground. Fracture features demonstrate the forces resulting in the fatigue cracking were applied to the bar from two opposing directions, indicating the winch bar had repeatedly been used with the tip angled both down (correct usage) and up (incorrect usage). If the winch bar was only used for its intended application and was properly inserted through the winch end cap holes, with the winch bar tip angled downward, any fatigue crack growth would only occur from the outside radius side of the bar.

The problem with Dr. Clark's conclusions is that these are at odds with the facts and lack any valid scientific basis.

At the time he rendered the opinion in this case, Dr. Clark:

(1)   had never operated a winch bar (Exhibit A, Clark Deposition, p. 26),

(2)   had never done a metallurgical analysis of a winch bar (Exhibit A, Clark Deposition, p. 16),

(3)  had never written a peer reviewed article on metallurgy or any other topic (Exhibit A, Clark Deposition, pp. 21-22),

(4)  did not know the actual working load limit of the Subject Bar and did not seek to find that out (Exhibit A, Clark Deposition, p. 59),

(5)  had had his testimony limited in a case in Texas where he was not allowed to testify about welding processes, a critical issue here (Exhibit A, Clark Deposition, p. 25),

(6)  did not know the kind of welding process used on the Subject Bar and did not ask for that information from his client (Exhibit A, Clark Deposition, pp. 51-52); and

(7)  relied on completely unsupported supposition to buttress his opinion that the bar was used improperly, but then agreed that the misuse he conjectured would not have caused the fracture in any event. (Exhibit A, Clark Deposition, pp. 35, 44-48-49, 64-65, 84)

Clark's opinion that the bar was used in an improper manner is completely unsupported by the evidence, beyond his expertise, and will not aid the trier-of-fact. For example, he states with no factual basis (in an obvious attempt to mischaracterize the warning to create plaintiff fault), that the manufacturer required a user to stand to the side of the bar, not behind the bar, when the bar was being used. An examination of the actual warning label affixed to the Subject Bar (Exhibit C) shows that the warning was to not lean over the bar during use. So, Dr. Clark's claims are clearly unreliable according to the manufacturer's own labeling. Dr. Clark also states in his report that the bar was used improperly because it had been – at some time - inserted both tip down and tip up. However, at his deposition Dr. Clark was forced to acknowledge that the tip up insertion, if it occurred, (a) would have nothing to do with potential for fracture but rather

5

with the possibility of the bar rotating if it was used in that position, (Exhibit A, Clark Deposition, p. 84) and (b) that the instruction to use tip down was not in effect at the time the Subject Bar was put into service (Exhibit A, Clark Deposition, p. 56).  That instruction appears nowhere on the label that was affixed to the Subject Bar, but was a subsequent addition on later-manufactured products.

Dr. Clark contends (a) that the bar was improperly used because he guesses that Mr. Bruce was standing behind the bar and not to the side of the bar at the time it was being used (absolutely no evidence of this and not contraindicated by the manufacturer's instructions); (b) that the bar had been used tip up and tip down (Clark was forced to admit that this had nothing to do with the mechanism of fracture and, moreover, the tip down instruction did not appear on the bar until after the Subject Bar was put into service); and (c) that a "cheater bar" purportedly used to apply more force had at some point been used on the <u>box end</u>, not tip end, of the bar (no evidence to support this, and Clark was forced to concede, yet again, that he could not establish that the conjectured "cheater bar" had anything to do with the mechanism of fracture).  (Exhibit A, Clark Deposition, p. 49)  There is absolutely no evidence that the bar was in any sense misused.  Clark's supposition that the loading forces on the bar exceeded the working load of the bar at some point is completely useless as he did not and does not even know the working load limit of the bar.  Clark's failure to even inquire about the working load limit of the bar and to seek information on the critical issue of the welding process speaks volumes about the validity of his opinion.  He fails to conform with proper, scientifically-accepted methodology.  His testimony will not aid the trier-of-fact and will, instead, introduce junk science.

Clark's willful refusal to seek information that might imperil his unsupportable conclusions is exemplified on Page 23 of his report at Figure 28.  After emphasizing the critical

nature of scanning electron microscopy in the analysis of the Subject Bar, Dr. Clark chose a single, blurry photograph at a minimal 25x enlargement. Clark admitted that the microscope that he borrowed for his analysis had a potential magnification of 10,000x. (Exhibit A, Clark Deposition, p. 75). He then tried to qualify by saying that "often in most failure analysis work, it is my experience it is very, very rarely that you can get up to about 5,000. Most examinations are done 500 to 1,000 maximum." (Exhibit A, Clark Deposition, p. 76). Clark was unable to offer any explanation as to why he picked the single, 25x magnification, very blurry photograph to illustrate his conclusions. (Exhibit A, Clark Deposition, pp. 76-77).



Dr. Parse's Declaration under penalty of perjury (Exhibit D) explains that the magnification used by Clark is a magnification more than 100 times less than typically used for this purpose and,

7

moreover, that the photograph is so out of focus that it renders the photograph of no investigative use. Also significant is the fact that Clark did not produce any other photographs that he took during the electron microscopy, citing this as a "representative" sample. (Exhibit E, Clark Report, p. 23, Figure 28; (Exhibit A, Clark Deposition, pp. 76-78). Clark's failure to follow proper methodology was even more obvious when Clark was examined about the number of load cycles to which the Subject Bar had been subjected prior to failure. At Page 82 of Clark's deposition, he was asked:

> Q. Okay, did you try to determine how many cycles the subject bar had been subjected to?
>
> A. At this magnification, that's not possible.

This gerrymander of the facts was required for Clark to reach his conclusion that while the fracture occurred at the site of the weld, the weld had nothing to do with the fracture. (Exhibit A, Clark Deposition, pp. 72-73).

### Dr. Clark's Testimony Should be Excluded.

Dr. Clark's testimony does not meet the *Daubert* standard for reliability. Rule 702 provides that an expert witness "qualified . . . by knowledge, skill, experience, training, or education," may testify when scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. Fed.R.Evid. 702. For the testimony to be admissible, Rule 702 requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. Id.

In *Daubert*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only

relevant, but reliable." 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. See *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. See *Daubert*, 509 U.S. at 593. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. See *Id*. at 590. Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant. See *Id*. at 591.

    In this case, Dr. Clark failed to obtain the most basic information, such as the working load limit of the bar and the type of welding process used to affix the tip to the shaft. He relied on complete speculation, deciding that because he had difficulty peeling off a label from one of the exemplar bars that the label on the five year old Subject Bar must have been deliberately removed (what this has to do with anything is a mystery, as Clark was also forced to admit that the tip orientation information contained on later labels was not contained on the Subject Bar). He also engaged in completely unwarranted speculation about: the mechanics of what Mr. Bruce was doing at the time of the accident, uses to which the opposite end of the bar may or may not have been put during the life of the bar, and the conditions under which the bar had been used. Lastly, Clark elected to jettison scientific and factual information that was bad for the defendant.

Result oriented speculation, guesswork, and, one supposes, clairvoyance, do not form a basis for an opinion admissible under Article 702.

The Fifth Circuit maintains that district courts are to "function as gatekeepers and permit only reliable and relevant expert testimony to be presented to the jury." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). It is the role of the district court to assure "that the proffered witness is qualified to testify by virtue of his knowledge, skill, training, or education." *Id*. (quoting FRCP 702). A court "should refuse to allow an expert witness to testify if the witness is not qualified to testify in a particular field or on a particular subject." *Id*. This testimony will not assist the trier-of-fact. It should be excluded.

## Conclusion

In short, Dr. Clark's opinion is short on accurate facts and proper scientific methodology and long on guesswork. It is replete with self-serving statements and non-science. It clearly does not meet the standard for reliability under *Daubert* and *Kumho* and should be excluded.

Respectfully submitted:

*/s/ Jennifer N. Willis*
JENNIFER N. WILLIS (#14877)
WILLIS & BUCKLEY, APC
3723 Canal Street
New Orleans, Louisiana 70119
Telephone: (504) 488-6301
Facsimile: (504) 488-6302
jenniferwblaw@bellsouth.net

>GARY J. GAMBEL   (#19864)
>MURPHY, ROGERS, SLOSS, GAMBEL
>  & TOMPKINS
>One Shell Square, Suite 400
>701 Poydras Street
>New Orleans, Louisiana   70139
>Telephone:  (504) 523-0400
>Facsimile:     (504) 523-5574
>ggambel@mrsnola.com
>
>*Counsel for Plaintiff, Thomas Bruce*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been served on all counsel of record electronically using the Court's CM/ECF system, to which all attorneys in this case have subscribed, on this 24th day of January, 2018

>*/s/ Jennifer N. Willis*