## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THOMAS BRUCE             CIVIL ACTION NO.
          2:17-cv-03940-JTM-JCW

VERSUS
ANCRA INTERNATIONAL, LLC

DEPOSITION OF MARSHAL D. CLARK, Ph.D.,
P.E., given in the above-entitled cause,
pursuant to the following stipulation, before
Raynel E. Schule, Certified Shorthand Reporter
in and for the State of Louisiana, at the Law
Offices of Messrs. Lewis, Brisbois, Bisgaard &
Smith, LLP, 400 Poydras Street, Suite 1320, New
Orleans, Louisiana, 70130, commencing at 10:10
o'clock a.m., on Thursday, the 18th day of
January, 2018.

## Page 2

```
 1                I N D E X
 2                               Page
 3    Caption                     1
 4    Appearances                 3
 5    Agreement of Counsel        4
 6    Examination
 7       MS. WILLIS               5
 8       MR. TYNAN                88
 9    Reporter's Certificate      94
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2
     For the Plaintiff:
 3
     MESSRS. WILLIS & BUCKLEY, APLC
 4   Attorneys at Law
     BY: JENNIFER N. WILLIS, ESQ.
 5   3723 Canal Street
     New Orleans, Louisiana  70119
 6
 7   For the Defendant:
 8   MESSRS. LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
     Attorneys at Law
 9   BY: JOSEPH P. TYNAN, ESQ.
     400 Poydras Street, Suite 1320
10   New Orleans, Louisiana  70130
11
     Reported By:  Raynel E. Schule
12               Certified Shorthand Reporter
                 State of Louisiana
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1             S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3   between Counsel for the parties hereto that the
 4   deposition of MARSHAL D. CLARK, Ph.D., P.E. is
 5   hereby being taken pursuant to the Federal Rules
 6   of Civil Procedure for all purposes in
 7   accordance with law;
 8        That the formalities of reading and
 9   signing are not specifically waived;
10        That the formalities of sealing,
11   certification, and filing are hereby
12   specifically waived.
13        That all objections, save those as to
14   the form of the question and responsiveness of
15   the answer, are hereby reserved until such time
16   as this deposition or any part thereof is used
17   or sought to be used in evidence.
18                * * * * *
19        Raynel E. Schule, Certified
20   Shorthand Reporter in and for the State of
21   Louisiana, officiated in administering the oath
22   to the witness.
23
24
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**



## Page 5

1    MARSHAL D. CLARK, Ph.D., P.E., having
2  been first duly sworn by Raynel E. Schule,
3  was examined and testified on his oath as
4  follows:
5             EXAMINATION
6  BY MS. WILLIS:
7  Q.  Dr. Clark, we met a minute ago.  My name is
8     Jennifer Willis.  I'm one of the
9     Plaintiff's lawyers in this case.  I'm
10     going to run through your qualifications
11     with you and then go directly to your
12     report.  If I ask you something that you
13     don't understand, please stop me, and I'll
14     be glad to explain it or rephrase it, but
15     if I ask you something and you answer it,
16     I'm going to assume that you understood my
17     question, okay?
18  A.  Okay.
19  Q.  Tell me about your educational background.
20     You went to the Colorado School of Mines
21     both for your undergraduate and graduate
22     degrees.  Is that correct?
23  A.  That is correct.
24  Q.  Okay, and after that, run through your
25     employment history with me if you would.

## Page 6

1  A.  When I graduated with my undergraduate
2     degree in 1979, my first job was with Otis
3     Engineering in Dallas, Texas -- Carrollton,
4     Texas.  They are part of the Halliburton
5     Corporation's manufacture of oil field
6     tools.  I ran the metallurgical laboratory,
7     did failure analysis, wrote heat treat
8     specifications, materials specifications,
9     oversaw the production of our equipment in
10     terms of testing, mechanical testing as
11     well as doing any sampling that we would do
12     metallographically.  From there, I went
13     back to Colorado in 1981.  I grew up in
14     Colorado, and I went to work for Stone &
15     Webster Engineering, which was a -- a large
16     engineering constructor primarily of
17     utility plants, but we did other industrial
18     facilities as well.  So we would build
19     coal-fired, gas-fired, nuclear,
20     hydroelectric power plants.  I was in the
21     Materials Engineering Group originally.  I
22     eventually became the coordinator of the
23     Materials Engineering Group in the Denver
24     office, also did a lot of geothermal power
25     plants at the time.  In 1994 they had gone

## Page 7

1     from 15,000 people to 3500 people.  So I
2     went back to graduate school initially on a
3     part-time basis and than decided to go back
4     full time.  So I was in grad school from
5     1994 through 2001 I believe.  My research
6     involved the development of hydrogen
7     cracking resistant weld filler metals for
8     the Navy's HSLA Steel Program.  So it was
9     characterization of microstructures and
10     like I said, developing these high-strength
11     filler metals for the Navy program.  I
12     graduated -- during that time, I also had
13     my independent consulting business because
14     I had continued to work with utility
15     clients performing failure analysis for
16     them.  When I got out of grad school --
17  Q.  Let me stop you just for a second.
18  A.  Sure.
19  Q.  That is the same company that you currently
20     are with, correct?
21  A.  Yes.
22  Q.  It had a name change at some point?
23  A.  Initially, I was Clark Metallurgical
24     Engineering, and then after about a year, I
25     think it was, maybe two, I incorporated and

## Page 8

1     became Investigative Engineering.
2  Q.  When I looked at the incorporation
3     documents from the Secretary of State, the
4     incorporator was listed as someone else.
5     Was there ever anyone else involved in the
6     corporation?
7  A.  That's probably my attorney, Joe Morris.
8  Q.  Joe Morris, that's right.  And so you
9     worked there and -- and at some point, it
10     went dormant, the company did --
11  A.  Yes.
12  Q.  -- and you were no longer in good standing,
13     and then you came back.  Is that right?
14  A.  I basically retired the corporation for a
15     period of time, yes.
16  Q.  But not the name because that's what you're
17     using now?
18  A.  Correct.
19  Q.  Okay.  So that -- you did that while you
20     were in grad school, and then you went to
21     work according to this as Senior
22     Consultant, Engineering Systems, Inc.  Tell
23     me what that is.
24  A.  So they are a -- primarily a forensic
25     engineering firm.  They were originally

2  (Pages 5 to 8)

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 9

1   started in the Chicago area, but they had
2   an office in Colorado Spring. I had gotten
3   busy enough that I either needed to hire
4   people or merge with another company. I
5   basically became part of them. I was a
6   part owner for a period of time in Colorado
7   Springs, but one of my major clients was an
8   utility in the western United States. It
9   was called PacifiCorp at the time. It was
10  a merger between Utah Power & Light and
11  Pacific Power & Light. I had worked with
12  them when I was with Stone & Webster and
13  continued through my graduate studies, and
14  they said they wanted to hire a
15  metallurgical engineer and if I had a
16  recommendation. I looked at my billings.
17  They were a significant portion of my
18  billings. I always enjoyed working with
19  them, so I said that I would come to work
20  for them.
21  Q.  You used the term, "forensic engineering,"
22  and I've deposed a lot of forensic
23  engineers, and I know people use that term
24  differently. Tell me how you're using
25  that.

Page 11

1   Q.  And what were you doing for PacifiCorp?
2   A.  I was a Principal Engineer in Generation
3   Engineering. I oversaw our owner user
4   welding inspectors. Under the ASME Oil and
5   Pressure Vessel Code you have
6   jurisdictional requirements for the
7   inspection of pressure vessels and boilers.
8   We had our own user program where we could
9   do the welding and inspection of our
10  equipment. I oversaw those two inspectors.
11  I also did the failure analysis for them,
12  and I would assist with putting together
13  inspection programs for high energy piping
14  systems and assist the boiler engineer in
15  putting inspection programs together on our
16  boiler equipment.
17  Q.  Okay, and you left there in 2006, correct?
18  A.  Correct.
19  Q.  What were the circumstances of your leaving
20  there?
21  A.  I had an opportunity to go to work for
22  Structural Integrity. To be quite honest,
23  I went -- one of the main reasons you go
24  with an utility besides the fact you enjoy
25  the work is they tend to be a reliable

Page 10

1   A.  Somebody that analyses failures, primarily
2   focusing on litigation and expert
3   testimony.
4   Q.  Okay. So would it be fair -- and I -- I
5   don't want to mischaracterize this. Would
6   it be fair to say at this point your focus
7   moved from doing hands-on engineering to
8   doing litigation consulting?
9   A.  The nature of my work really didn't change.
10  I was still doing failure analysis. It's
11  just that company focused more on doing
12  issues associated with litigation. My
13  work, I still went out and provided
14  engineering support on power plants during
15  outages, condition assessment work, did
16  their failure analysis work for them and
17  occasionally did litigation support.
18  Q.  And that was through '06?
19  A.  No. That was -- it was a very short time,
20  because PacifiCorp wanted to hire somebody,
21  so I think --
22  Q.  Well, I think that's what I'm asking you.
23  A.  Engineering Systems.
24  Q.  And then PacifiCorp was 2003 to 2006?
25  A.  That's correct.

Page 12

1   position with good retirement programs and
2   so forth, and in 2006, Berkshire Hathaway
3   purchase PacifiCorp, and they changed the
4   program, and I hadn't been there long
5   enough to get a retirement program from
6   them, so I decided -- when the offer came
7   up from Structural Integrity, I decided to
8   -- to move with them, and I opened an
9   office for Structural Integrity in the Salt
10  Lake City area.
11  Q.  And what does or did Structural Integrity
12  do?
13  A.  They did a lot of -- they're an engineering
14  corporation to -- to a large degree. About
15  half of their capabilities is engineering,
16  stress analysis, helping clients take
17  components that have service-developed
18  damage and assess whether it needed to be
19  repaired, replaced, or whether they can
20  continue to run with it for a period of
21  time. They also had a group that did
22  high-end non-destructive examination, like,
23  linear phased array ultrasonics, focused
24  array ultrasonics, time of flight
25  defraction, and they put together condition

Page 13

1  assessment programs to go out and inspect
2  power plants when they had problems
3  developing, and then I had a small group
4  that because the President of the company
5  recognized that because they had a lot of
6  very experienced senior experts in the
7  industry, they would occasionally get asked
8  to do expert testimony, and I was asked to
9  help form a group that kind of focused on
10  making sure that we had procedures in place
11  to deal with that, did conflict checks and
12  those types of things.
13  Q.  And that was 2006 to 2012, correct?
14  A.  Correct.
15  Q.  Okay.  Is it fair to say that most of your
16  work has been at least in some respect in
17  the utility field?
18  A.  I would say probably the majority of it, a
19  large -- yeah, I mean, most of it relates
20  to failure analysis of power generation and
21  utility equipment, although I've worked in
22  other industries as well.
23  Q.  And then from 2010 to 2012 you became the
24  principal of Forensic Consultants Group,
25  LLC.  Tell me about that.

Page 14

1  A.  It was a group -- there was another
2  individual that was with me, that was with
3  Structural Integrity with me, and we had
4  talked about setting something up as an
5  organization for when we retired from SI or
6  left SI and going into partnership, and we
7  formed that organization for a period of
8  time.  I purchased my lab equipment under
9  that, and he and I just decided we worked
10  better on our own, so we didn't keep that
11  organization.
12  Q.  And in 2012 to present you're back as
13  President of Investigative Engineering
14  Corporation, correct?
15  A.  That's correct.
16  Q.  And is that a forensic consulting company?
17  A.  I would say probably 20 percent of it is
18  forensic.  80 percent of it involves doing
19  routine failure analysis and assisting
20  clients with materials-related problems.
21  Q.  Okay.  Do you also have a focus in that on
22  energy-related clients?
23  A.  I would put it more towards that I have a
24  focus on piping, pressure piping systems,
25  pressure-related systems, failure analysis

Page 15

1  of mechanical equipment, because most of
2  the people I know, most of my failures do
3  come from the utility industry, but I get
4  them from other industries as well.
5  Q.  And that wasn't a particularly good
6  question.  I think what I'm trying to ask
7  is, are most of your clients in the utility
8  industry?
9  A.  Yes.
10  Q.  Okay.  When were you first contacted in
11  this case?
12  A.  I honestly don't remember, but probably
13  about two to three months ago.
14  Q.  So sometime --
15  A.  October, November, maybe.
16  Q.  Do you have anything with you that would
17  indicate when you were first contacted?
18  A.  No.
19  Q.  And were you contacted by Mr. Tynan?
20  A.  Yes.
21  Q.  Okay.  What were you told on that initial
22  contact?
23  A.  That there was a failure of a winch bar,
24  and they were looking for somebody who
25  could assist them with performing

Page 16

1  metallurgical assessment of a -- of the
2  failure.
3  Q.  Had you ever done a failure assessment on a
4  winch bar before this case?
5  A.  No.
6  Q.  What were you told about the manufacturer
7  of the winch bar?
8  A.  Other than their name, I wasn't given any
9  specifics.
10  Q.  The name being Ancra?
11  A.  That's correct.
12  Q.  Were you told that it was manufactured in
13  China for Ancra?
14  A.  Not during the initial contact.
15  Q.  Okay.  What materials did Mr. Tynan provide
16  you?
17  A.  I have the drawings, and I don't remember
18  the numbers of them off the top of my head,
19  but there's three or four drawings that
20  showed the engineering drawings that Ancra
21  specifies them off of.  There was a
22  document, two revisions of it that show how
23  they identify the manufacturer, the place
24  of manufacture, the date, and the year.  I
25  asked for Mr. Bruce's deposition, and I was

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 17

1    provided Mr. -- Dr. Parse's package that he
2    had provided.
3    Q.  Okay.  Anything else?
4    A.  Not that I can recall.
5    Q.  Ultimately you were provided with the bar,
6    correct?
7    A.  That's correct.
8    Q.  By my office?
9    A.  That's correct.  Yeah, I presume that's
10   where it came from.  I didn't look at the
11   label, and chain of custody didn't indicate
12   where it had actually come from, so.
13   Q.  Actually it did, but --
14   A.  Well, the block is empty.
15   Q.  Yeah, for -- for you to fill in.  We filled
16   it in when we sent it FedEx, and we left
17   the other block for you to fill.
18   A.  Oh, okay.  I think it says where was --
19   where it came from, and that block is
20   empty.
21   Q.  Well, and that brings me to my next
22   question, because the anticipation --
23   because we also included a FedEx return
24   label, correct?
25   A.  I didn't recall that.

Page 18

1    Q.  Okay.
2    A.  It may still be on the package.
3    Q.  Did you understand that that was supposed
4    to be sent back when you completed your
5    analysis?
6    A.  I did not.  I held onto it until it was
7    requested to be sent back.
8    Q.  And when was that?
9    A.  It hasn't been requested to be sent back
10   until I got to the airport yesterday.
11   Q.  Okay.  So you didn't understand that it was
12   intended to be here for the deposition?
13   A.  No.
14   Q.  You were never told that?
15   A.  No.  What, I was told that at 7:00 -- about
16   9:00 o'clock yesterday morning when I was
17   at the airport.
18   Q.  But -- but Mr. Tynan never told you that
19   prior to the deposition?
20   A.  That's correct.
21   Q.  Okay, and you did not fill out the chain of
22   custody nor avail yourself of the FedEx
23   return label, correct?
24   A.  I have filled out the chain of custody that
25   I have received it.

Page 19

1    Q.  Okay.
2    A.  But it's still waiting to be requested to
3    be sent, in which case I'll fill out the
4    block and return it to be sent.
5    Q.  Okay, and it was packed in a box that was
6    very appropriate to its size, and all that
7    would have to be done to send it back is
8    put it back in the bubble wrap in which it
9    came, correct?
10   A.  It's waiting in the corner waiting to be
11   requested.
12   Q.  So it didn't require any exotic packing?
13   A.  It would be necessary to assure that the
14   fracture surfaces are reprotected so that
15   they don't get damaged in shipping.  I'd
16   want to make sure that the tape is secure
17   on the outside of the box, because it's a
18   relatively heavy item, and I wouldn't want
19   it to get lost by or damaged if they
20   handled it poorly.
21   Q.  But in terms of protecting the fracture
22   surface it came to you in bubble wrapped on
23   the fracture surface and all you'd have to
24   do is rewrap it, correct?
25   A.  Well, there was also some material over the

Page 20

1    fracture surface, and it was taped.  So
2    that would be necessary to do.  You'd want
3    to make sure that the loose parts don't
4    cling together, so yeah, you've got to make
5    sure that they're wrapped properly.
6    Q.  But that's not very hard to do, is it?
7    A.  No.
8    Q.  After you were provided the materials that
9    you described to me a few minutes ago, what
10   did you do next on this case?
11   A.  I can't explain the specific order of
12   things, but you start by first thing, I did
13   when the part arrived is I --
14   Q.  No, no.  Prior to receiving the bar itself,
15   what did you do?  You told me that you had
16   received some drawings and some other
17   materials from Mr. Tynan prior to your
18   receiving the bar.  What work did you do on
19   the case prior to the time that you got the
20   bar?
21   A.  Oh, I don't think that's a correct of what
22   I said.  If it is I'm -- I'm sorry.  I
23   didn't receive the drawings until after I
24   had received the bar.  The only thing I
25   knew was that there would be an upcoming

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 21

1    case, and it involved Ancra. About the
2    only thing I did was go onto the website
3    and see who Ancra was.
4    Q.  I get it.  I misunderstood that.  So you --
5    you received the bar from me first, and
6    then after that you received the materials
7    from Mr. Tynan?
8    A.  I believe that's correct.
9    Q.  I didn't -- actually, I had a couple of
10    other questions on your CV, so let me ask
11    you that before I lose my place.  You list
12    some publications here.  Are any of those
13    publications peer reviewed publications?
14    A.  I don't believe the actual publications
15    are.  I believe the Gatlinburg Welding
16    stuff presentations, "Trends in Welding
17    Research" would have been the -- the
18    presentations are reviewed before the
19    presentation is put together.
20    Q.  You understand what I mean by peer review?
21    A.  Yes.
22    Q.  Okay, and so you're saying that that
23    presentation was peer reviewed or that it
24    --
25    A.  I believe --

Page 22

1    Q.  -- or that it was a jury presentation where
2    you were picked?
3    A.  Yes, a jury presentation where you're
4    picked.
5    Q.  So none of these publications that you list
6    here are in peer review journals, correct?
7    A.  I don't believe so.
8    Q.  Okay.  You also said that you have an -- an
9    academic appointment of some sort, let's
10    see, an Adjunct Associate Professor.  Is
11    that correct?
12    A.  That's correct at the University of Utah.
13    Q.  Tell me what that -- what that means.
14    A.  When I was in Utah, and I'm still on the --
15    the records over there, I taught a course
16    in a -- both a senior undergraduate and
17    graduate level course in failure analysis
18    for the department, and an adjunct is a
19    non-full time faculty member.
20    Q.  Right, I know -- I mean, I'm an adjunct, so
21    I know that means, but I'm just asking you
22    what you did there.
23    A.  Correct.
24    Q.  You taught one course?
25    A.  That's correct.

Page 23

1    Q.  Okay.  For how long?
2    A.  I taught it in 2006 I believe is the only
3    time I taught it.  I'm now preparing
4    basically a similar course to be teaching
5    at the University of Denver in the spring
6    semester this year.
7    Q.  But in terms of your work at the University
8    of Utah, you taught a single course for one
9    year.  Is that correct?
10    A.  That's correct, one semester actually.
11    Q.  In terms of your testimony, I understand
12    that you're only required by Rule 23 to
13    produce your testimony for a certain period
14    on this list.  Did you ever offer any
15    expert testimony prior to 2010?
16    A.  Probably two or three other cases.
17    Q.  And as I read this, you had a -- a single
18    case that went to trial on this list; is
19    that right, that Alcoa versus Luminant
20    case?
21    A.  That case went to trial back in the 1990s.
22    I also represented the State of Colorado in
23    a weld-related issue on a piping system at
24    the Freemont County Correction Facility,
25    and that was a trial in front of a Judge,

Page 24

1    no jury.
2    Q.  The Luminant case, which is listed in 2010,
3    that was an action to enforce a Consent
4    Judgment.  Is that correct?
5    A.  No.
6    Q.  Okay.
7    A.  It -- it -- I don't believe that would be a
8    correct interpretation.  They -- Alcoa
9    owned the property.  Luminant ran the power
10    plants on site.  Alcoa bought the power
11    back.  Alcoa allege -- alleged that they
12    had done improper maintenance and
13    inspections on welds and boiler tubes and
14    so forth, and that's what I was testifying
15    towards.
16    Q.  Okay, and who -- who were you offering
17    testimony on behalf of, Luminant?
18    A.  Luminant.
19    Q.  Luminant.  Okay.  Was there a challenge to
20    either your qualifications or methodology
21    filed in that case?
22    A.  Not that I recall.
23    Q.  Have you ever had a challenge filed as to
24    either your qualifications or methodology
25    in a case in which you've testified?

6  (Pages 21 to 24)

Page 25

1    A.  Not that I'm aware of.
2    Q.  So I guess my next question, which is, have
3    you ever had your testimony limited or
4    excluded?
5    A.  No.
6    Q.  Let's look at your report.  You have a copy
7    in front of you?
8    A.  Yes.  Let me back up on that.  So when I
9    did the case with the State of Colorado, I
10    was asked mostly to in terms of preparation
11    and specifications technical requirements,
12    codes and standards that should be used in
13    terms of piping systems.  Whether you have
14    -- the case actually involved weld
15    imperfections, and the owner of the
16    facility had requested the ability to do
17    spot radiography, which is a sampling of
18    welds, and when they found imperfections,
19    they expanded that plus they discovered
20    that the welders were not certified, and my
21    testimony is whether that inspection
22    protocol per the standards was an
23    appropriate thing to do, what the impact of
24    the imperfections would be.  I told the
25    Judge -- there were questions that I got

Page 26

1    asked about welding, and I told the Judge
2    that I was comfortable and experienced in
3    welding, and basically, they said we have
4    other experts that are doing it.  So my
5    testimony wasn't challenged per se, but I
6    was told -- I was young, and I was told
7    that wasn't what I was there for.
8    Q.  So you were limited basically to the
9    specifications rather than the specifics of
10    the welding process?
11    A.  Of -- of the weld, that particular welding
12    technique, yes.
13    Q.  And what was that welding technique?
14    A.  They would have done stick welding on
15    piping system, and if I recall it
16    correctly, they were doing 60/10 root pass,
17    in some of the failed process.
18    Q.  Have you ever operated a winch bar,
19    tightened down straps yourself?
20    A.  No.
21    Q.  Okay.  Have you ever operated a chain
22    binder?
23    A.  Yes.
24    Q.  Okay.  Now, a lot of your report -- I tell
25    you what, let's try to do this in a little

Page 27

1    bit better order.  I think the easiest way
2    to do this is just go through your report
3    in order so it might save us some time.
4    According to this you were retained to
5    analyze and provide opinions relating to
6    the cause of the failure of the winch bar,
7    the Ancra winch bar that failed in this
8    case, and you note that the tip of the
9    winch bar failed adjacent to the
10    circumferential weld sealing the tubular
11    bar handle to the machined and formed tip.
12    Now, we've all seen the bar.  So the bar is
13    straight like this (indicating) and then it
14    has a tip that comes off of it at an angle.
15    A.  We have an exemplar over there.
16        MR. TYNAN:
17        We have an exemplar over there if
18    you'd like.
19    BY MS. WILLIS:
20    Q.  Why don't we put this up.
21        MR. TYNAN:
22        Let the record reflect that I've
23    given Ms. Willis an exemplar Ancra bar
24    that I purchased on the Internet.
25        MS. WILLIS:

Page 28

1        Off the record for a second.
2        (Off the record.)
3    BY MS. WILLIS:
4    Q.  And we're looking at a bar which has a
5    label on it, "Warning," and a label that
6    says, "Winch Bar Combo Box Made In China,"
7    and it has the Ancra marking, which shows
8    the date of manufacture, in this case 2017,
9    correct?
10    A.  Yes.
11    Q.  Was this one of the bars that you used in
12    making your analysis?
13    A.  No.
14    Q.  Those were bars that you acquired?
15    A.  That's correct.  As it turns out, one of
16    the bars I bought has the exact same code
17    date, and the other one had a similar code
18    date.
19    Q.  And the subject bar, let's call it that
20    just to save time, the subject bar was
21    manufactured in 2013 according to the stamp
22    on it, correct?
23    A.  That is correct.
24    Q.  And were you able to determine the place of
25    manufacture?

7 (Pages 25 to 28)

Page 29

1   A.  The code stamping, the BL --
2   Q.  Huh-huh.
3   A.  -- indicates according to the documentation
4       where it was manufactured, and in the
5       package that I received, there was also
6       documentation I guess I failed to mentioned
7       that, the inspection records and shipping
8       records and receiving records for a
9       shipment of parts that would have coincided
10      with that.
11  Q.  Okay.  The inspection records from the
12      manufacturer in China or the inspection
13      records from Ancra?
14  A.  It had shipped -- it had receiving
15      verification from Ancra if I'm not
16      mistaken, and there was documentation that
17      said they had done the proof testing on the
18      lot, and I don't remember what else.
19          MR. TYNAN:
20          Let's go off the record for a
21      minute.
22          (Off the record.)
23          MS. WILLIS:
24          And while we're kind of in the
25      middle, I want to attach his CV.  The

Page 30

1       Notice will be "Clark 1."  The CV will
2       be "Clark 2," and the testimony list
3       will be "Clark 3," and I may attach the
4       report.  We'll just decide.
5   BY MS. WILLIS:
6   Q.  What testing -- when you say, "proof
7       testing," what testing did Ancra do
8       separate and apart from the testing that
9       was done in China, if any, on these bars?
10  A.  I'd have to go back and look at the
11      documents, but I believe it was primarily a
12      verification of receipt of the components
13      that they matched the requirements.
14  Q.  As I read it, and correct me if I'm wrong,
15      it was a visual inspection to make sure
16      that they were as they had been spec'd?
17  A.  I believe that's correct.
18  Q.  Okay.  There was no metallurgical testing
19      of any sort or weld testing done by Ancra,
20      correct?
21  A.  I don't believe there's any indicated,
22      that's correct.
23  Q.  At least from the documents that you've
24      been provided and I've been provided, there
25      was no indication that anything was done

Page 31

1       other than visual?
2   A.  I believe that's correct.
3   Q.  You conclude in Paragraph 2 on Page 1 that
4       the failure of the -- it wasn't Mr. Bruce's
5       winch bar, but the Ancra winch bar was the
6       result of the user failing to follow the
7       manufacturer's instructions regarding
8       proper use of the bar, or to perform the
9       manufacturer's recommended inspections.
10      Let's take them in reverse order.  What
11      inspection could Mr. Bruce have done that
12      would have revealed that the winch bar was
13      going to fracture?
14  A.  A visual inspection.
15  Q.  And what would that have told him?
16  A.  It would have told him there was a crack at
17      the tip.
18  Q.  And you're saying that that would have been
19      visible to the naked eye?
20  A.  The paint as a bare minimum would have been
21      fractured.  Yes, it would have been a tight
22      crack present.
23  Q.  And you're saying that that would have been
24      visible to the naked eye?
25  A.  It opened to the surface, yes.

Page 32

1   Q.  And just looking at it and seeing that the
2       paint was cracked should have told him that
3       there was something wrong with the bar?
4   A.  It would certainly lead you to believe that
5       there's something that caused the paint to
6       crack.
7   Q.  Other than just regular use?
8   A.  Yes.
9   Q.  Because I've seen a lot of winch bars, and
10      they're all pretty banged up, so --
11  A.  There's a difference between scraped paint
12      and cracked paint.
13  Q.  Okay, and you also state that the failure
14      of Mr. Bruce's winch bar was the result
15      of him failing to follow the manufacturer's
16      instruction.  Tell me about that.
17  A.  Both the manufacturer and also in the --
18      the Web & Sling Tie Down Association
19      recommendation -- recommended
20      specifications, they talk about standing to
21      the side of the bar to use the winch bar,
22      and I don't see how you could hit your
23      shoulder if you were standing to the side
24      of the bar to use the winch bar.
25  Q.  How does that -- what, if anything, does

8  (Pages 29 to 32)

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

Page 33

1   that have to do with the fracture?
2   A.  Well, it didn't cause the fracture, but it
3       does result in whether an individual could
4       properly use it or not.
5   Q.  Okay.
6   A.  And the other aspect is -- is that you
7       can't apply the same force to the bar using
8       it that way as you'd be able to as easily
9       by applying it the other way.
10  Q.  But that warning is not intended to prevent
11      bar fracture, is it?  And, in fact, putting
12      aside your opinion that he violated the --
13      the warning, which we don't agree with,
14      that had absolutely nothing to do with the
15      bar breaking, did it?
16  A.  You had to apply sufficient force to the
17      bar to initiate and propagate the crack.
18      In you stood to the side, it would be very
19      difficult if not impossible to apply
20      sufficient force to cause the observed
21      failure to propagate and crack as it did.
22  Q.  Well, tell me from a biomechanical
23      standpoint what kind of pressure he would
24      be able to assert in terms of PSI standing
25      behind it as opposed to the side.

Page 34

1   A.  Approximately his weight in both instances,
2       but what changes is the moment arm of the
3       application of the load.  If you're
4       standing here and you're applying this
5       (indicating), your center of applied force
6       is approximately here (indicating).  So now
7       you have the force that's applied
8       approximately like this (indicating).  You
9       apply that moment, whereas if you grab the
10      bar out here (indicating) and pull down on
11      it, you can put more leverage is one thing.
12  Q.  So your opinion that he was standing behind
13      it and not to the side is based on your
14      analysis of the injuries that he sustained?
15  A.  No, I didn't analyze the injury
16      specifically other than to say that he said
17      he was pulling down on it and hit his
18      shoulder.
19  Q.  Did he say whether he was standing behind
20      it or to the side?
21  A.  If you're standing to the side, it doesn't
22      seem reasonable that you would hit your
23      shoulder.
24  Q.  But you're just guessing, right, because
25      you don't know that?  He doesn't -- was he

Page 35

1   even asked whether he was standing to the
2   side or behind the bar?
3   A.  I believe he says he was pulling down on
4       the bar.  I wasn't there during the
5       deposition.
6   Q.  But you read it?
7   A.  I did.
8   Q.  Okay.
9   A.  And certainly the implication of the
10      testimony as I understood it was that he
11      was near the end pulling down on the bar.
12  Q.  Okay.  Well, that testimony will speak for
13      itself.
14  A.  Yes.
15  Q.  But you are surmising that he was standing
16      behind it?
17  A.  I'm surmising that he was likely not
18      standing to the side.
19  Q.  That he was standing behind it, okay.  And
20      that is a basis of your opinion in this
21      case?
22  A.  Actually, it has very little to do with my
23      opinion.  It's that -- because my opinion
24      is primarily based upon the fracture
25      characteristics that we're looking at.  My

Page 36

1   point is that I did do an analysis, and
2   you would be unable to apply the required
3   force if you're standing to the side
4   pushing down on the bar like that to drive
5   the existing fracture and replicate the
6   fracture characteristics that we've got.
7   Q.  What experiments did you do to establish
8       that?
9   A.  I did some, I mean, basic engineering
10      analysis of the applied forces where it
11      gets applied, how you can pull down on it.
12      I have familiarity working in other
13      projects where how you can apply forces and
14      how you can increase those forces through
15      acceleration, like, if you bounce on the
16      bar, for example, and so forth.  I did some
17      -- like I said some basic fracture
18      mechanics assessments to say what would be
19      -- we know what the final cross section of
20      the bar was.  What would be the kind of
21      load that would be required to break that
22      final section and fast fracture; what type
23      of force could you apply that would be
24      required to propagate a fatigue crack?  The
25      fatigue crack growth rates of both ferritic

9 (Pages 33 to 36)

Page 37

1  and pearlitic steels as well as martensitic
2  steels are well characterized, and so how
3  fast a crack will grow once it's initiated
4  to final fracture is -- is well understood,
5  and you can make some estimates of the
6  kinds of forces that would be required, and
7  if you stood to the side and applied a
8  normal force of an individual's weight in
9  the 200 to 300 range, you'd be looking at
10  thousands if not tens of thousands of
11  cycles to propagate the crack.
12  Q.  But whether he stood to the side or whether
13  he stood behind the bar, that was not what
14  caused the bar to fail, correct?  I think
15  you just said that.
16  A.  It was the application of an excessive
17  load, and I'm saying if he stood to the
18  side, that would be very difficult to do.
19  Q.  But absent the defect in the bar itself, it
20  wouldn't have cracked just because he was
21  tightening down on some straps?
22  A.  I don't believe it would have cracked if he
23  was tightening down on it.  If whoever used
24  it tightened down on it properly, it
25  certainly can crack if you exceed the

Page 38

1  initiation strength, the fatigue crack
2  endurance limit of the material, yes.
3  Q.  Say that again, because I didn't understand
4  what you just said.
5  A.  Fatigue cracks do not require -- let me ask
6  you to ask your question again, make sure I
7  answer it correctly.
8  Q.  Here's -- here's my question.  I thought
9  you understood or I took you to say earlier
10  because we were reading this paragraph that
11  the failure of the winch bar was the result
12  of the user failing to follow the
13  manufacturer's instruction.
14  A.  Huh-huh.
15  Q.  And I'm asking you to explain to me how
16  that is.  You've told me that you believe
17  that he was standing behind the bar and not
18  to the side, but the bar is not designed to
19  fail, correct?  It's not supposed to crack
20  and fail?
21  A.  It's not if it's used properly.
22  Q.  Well, what is improper use that would cause
23  something to crack in this manner?
24  A.  Excessive loading.
25  Q.  And so you believe this was subject to

Page 39

1  excessive loading?
2  A.  Yes.
3  Q.  Okay.  Now, if another engineer were asked
4  to replicate what you just described to me
5  that you did in order to determine whether
6  he was standing to the side or whether it
7  was excessive loading, how would he or she
8  go about doing that?
9  A.  Same way I did.  Let me explain the -- the
10  loading to the side point is the bar was
11  excessively loaded.  If you stood to the
12  side, it would be very difficult if not
13  impossible to excessively load it.  So
14  that's why I'm saying it was improper
15  usage, because it was excessive loading.
16  Q.  Okay, or there was something wrong with the
17  bar?
18  A.  And I don't see that on the fracture
19  characteristics.
20  Q.  But you are assuming -- you're making an
21  assumption that it was subject to excessive
22  loading because of improper use?
23  A.  I'm making the assumption that the fracture
24  characteristics are consistent with loads
25  that would have been required would be

Page 40

1  excessive.
2  Q.  Are you aware of the fact that when Mr.
3  Bruce was loading this, he had not -- when
4  he was tightening the winch bar that he had
5  not completely tightened down on the
6  straps, that he was in the middle of the
7  process when this fracture occurred?
8  A.  I wasn't there.  I can't say.  I don't
9  believe his testimony specifically speaks
10  to that.  It's pretty clear what kind of
11  force would have been required to cause the
12  final fracture.  It's also as I said,
13  fatigue crack propagation occurs at a very
14  specific, well characterized rate, and you
15  can -- so there's -- what he did at the
16  very end and what was done during the life
17  of this bar, and it wasn't only at the last
18  usage that we had that load.  We had to
19  have excessive forces throughout the life
20  of this bar.
21  Q.  Let me -- you said that it's well known
22  what amount of force would have caused this
23  fracture.  Can you characterize that amount
24  for me?
25  A.  What I said is the crack growth

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

Page 41

```
 1    characteristics for ferritic, pearlitic
 2    steels and martensitic steels are well
 3    characterized. Using that, you can
 4    estimate what kind of -- what kind of
 5    forces would be required to propagate the
 6    crack and cause the final fracture.
 7  Q.  What amount of force was being applied to
 8    it when it fractured?
 9  A.  The final fracture -- well, it depends on
10    where you're standing and how it was
11    applied, probably something on the order of
12    his 200 pound, something like that
13    depending on where he applied it at.
14  Q.  Okay.
15  A.  But that's only because you were down to 20
16    percent of the remaining cross section by
17    that point in time.
18  Q.  Because this bar is designed to handle a
19    lot more than 200 pounds of pressure,
20    right?
21  A.  The bar, I don't know what the ultimate
22    design of the bar is, because it's not the
23    weak link. The weak link is actually the
24    winch and the web strap. If you applied,
25    for example, the 300-pound proof load that
```

Page 42

```
 1    the manufacturer is required to do on the
 2    lots of bars, I don't remember specifically
 3    how many, that would exceed the working
 4    load limit of the tie down straps and the
 5    winch. So they are actually the weaker
 6    link of the component.
 7  Q.  So you're saying that the winch would fail
 8    before the bar failed under normal
 9    circumstances?
10  A.  What I said is that you would exceed the
11    working load limit of those components, and
12    the fail -- the risk of failure does
13    increase significantly, and those have the
14    potential of stored energy, which could be
15    much more harmful. Web material itself is
16    like an elastic band to some extent, and it
17    stores energy. So yes, I mean, all of the
18    documents, all of the manufacturing
19    requirements say do not exceed the -- the
20    lowest of the working load limit of the
21    components.
22  Q.  And you saw those documents where?
23  A.  I have gone -- there is the Ancra catalogs
24    talk about that. The Web & Tie Down
25    Association documents talk about that. I'd
```

Page 43

```
 1    have to go back and look, but I'm pretty
 2    sure -- I don't know if that's true or not.
 3    I looked at the Federal Regulations, and I
 4    think there are some requirements about
 5    that as well.
 6  Q.  Is that on the bar anywhere, don't exceed
 7    the load limit of the weakest component?
 8  A.  No, I don't know. I don't believe -- I
 9    don't know.
10  Q.  I mean, you have it in front if you want to
11    look.
12  A.  Well, it's a different bar.
13  Q.  Well, it's the same bar made a different
14    year, but yes, is it on there now?
15  A.  No. What it -- what it says, "This winch
16    bar is intended to be used by qualified
17    trained personnel in accordance with
18    applicable load secure standards. Refer to
19    WSTDA, FMSCA, and NACM and all other
20    applicable Federal, State, and Provincial
21    Standards." So the WSTDA are the standards
22    I referred to. "Check winch and winch wire
23    for defects and proper operation prior to
24    less" -- "less tensioning or releasing tie
25    down. Do not use if damaged. Do not alter
```

Page 44

```
 1    or increase the length of the winch bar,
 2    cheater bar. Do not reach or lean across
 3    winch bar during operation. Keep clear of
 4    the moving winch bar as it may whip during
 5    release of winch bar binder. This winch bar is
 6    designed to be used only in a position
 7    angled downward from the winch" -- "from
 8    the pivot point. Use of the bar in any
 9    other position may cause the bar to roll.
10    Winch pall must be in the proper working
11    order and fully engaged during operation.
12    Do not use a combination winch bar to
13    tension or lever chain binder. Doing so
14    may result in binder ten" -- "ten" --
15    "tensions exceeding applicable working load
16    limits. When required Ancra recommends the
17    use of combination winch bar with a lever
18    chain binder for load release only."
19  Q.  And that's -- that last warning is related
20    to use of a chain binder, not with a winch
21    bar with straps, right?
22  A.  That last statement did, yes.
23  Q.  Does it say, "Don't stand behind the bar"?
24  A.  Yes, it says basically I take that to --
25    "Do not reach or lean across winch bar
```

11  (Pages 41 to 44)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 45

1    during operation."
2    Q.   And your interpretation of that is don't
3    stand behind the bar while you're operating
4    it?
5    A.   I take that to mean don't reach or lean
6    across the bar during operations, keep
7    clear of the moving winch bar.
8    Q.   If I'm standing back here doing this
9    (indicating), I'm not leaning across the
10   bar during operation?  I mean, you're
11   telling me that he shouldn't stand behind
12   the bar.
13   A.   You wouldn't hit your shoulder if you're
14   standing back there, right?
15   Q.   You have a biomedical degree, doctor?
16   A.   No.
17   Q.   Okay, and those references to the Federal
18   Standards, you've got somebody with a winch
19   bar and not even a high school education
20   who knows how to operate winch bars because
21   he has been doing it for years, is it
22   reasonable expectation for that person to
23   go look up those standards?
24   A.   I would expect whether it's the individual
25   or the owner of the company that's asking

Page 46

1    him to use it to make sure that the
2    individual that's using it is aware of the
3    requirements, yes.
4    Q.   I'm not sure that answers -- that answer
5    was to the question I asked.  Is it
6    reasonable to expect the operator of the
7    bar to look up the Federal standards that
8    are annotated on that of the Web Sling &
9    Tie Down Association?
10   A.   I believe it is appropriate for that
11   individual to be aware of the requirements,
12   whether they look them up and read them or
13   they've been instructed that way.
14   Q.   And I think we've established that you
15   yourself have never operated a winch bar to
16   tighten down straps, correct?
17   A.   I mean, if you ask me if I've ever used a
18   winch bar, I've not used this type of winch
19   bar on a flatbed truck.
20   Q.   Have you ever used one to tighten down
21   straps?
22   A.   Likely.  I've certainly used winch straps,
23   and I very likely have used a winching
24   device to tighten down straps in my life.
25   Q.   Where did you stand while you were doing

Page 47

1    it?
2    A.   Don't know.
3    Q.   You note on the bottom of Page 21 that
4    oxidation of the fracture surface shows
5    that two sizeable fatigue cracks were
6    present at the tip of the winch bar prior
7    to the last use.
8         MR. TYNAN:
9         What was the page?
10        THE WITNESS:
11        At the bottom of Page 1.
12        MS. WILLIS:
13        Page 1, last paragraph.  Sorry.
14        MR. TYNAN:
15        Thank you.
16   BY MS. WILLIS:
17   Q.   Would those have been visible to the naked
18   eye, the two sizable fatigue cracks?
19   A.   Where they broke the surface of the bar,
20   they would have been, yes.
21   Q.   Prior to the fracture?
22   A.   Yes.
23   Q.   Okay.  Let's look at Page 2, "Mechanical
24   damage" -- paragraph, second full
25   paragraph, "Mechanical damage to the box

Page 48

1    end of Mr. Bruce's winch bar documents its
2    improper use.  While there is no known
3    direct correlation to the failure at the
4    winch bar tip, mechanical damage
5    (brinelling)" -- and that's what, dents,
6    right?
7    A.   Correct.
8    Q.   -- "on box end indicates a bar was inserted
9    at an angle through the box end and either
10   the winch bar was used to leverage that
11   bar, or it is possible the angled bar was
12   used as a 'cheater bar' to apply additional
13   force to a winch."  The second sentence in
14   there says there's no known -- known direct
15   correlation of the failure of the winch bar
16   tip, so what's the purpose of these
17   statements?
18   A.   What I mean by at this point in time is
19   that certainly the final failure, and I
20   don't know when or what purpose of that
21   was, so I can't directly correlate it.  I
22   don't know why they brinelled it that way.
23   Could it have contributed to the
24   development of the fatigue cracks?  Yes,
25   but I have no direct correlation.

Page 49

1   Q.  You can't say that more probably than not
2       it did?
3   A.  No.  What I can say is that it shows that
4       that end of the bar was not used as
5       intended.
6   Q.  Okay, and I guess, I mean, not to be
7       flippant, but so what?  What does that have
8       to do with the failure of the tip?
9   A.  It indicates that somebody at some point in
10      time has used the bar for an unintended
11      application.  So I can't know what else
12      they've done.
13   Q.  Okay.  Let's go to Page 3.  Okay.  You say
14      that there are three pieces, and I'm just
15      going to have to try to describe it for the
16      record.  There's for lack of a better word,
17      the end opposite the tip --
18   A.  Yes.
19   Q.  -- which is shaped sort of rectangular.
20   A.  I believe they call that the box end.
21   Q.  Box end.  That sounds right.  Then we have
22      the shaft, and then we have the tip, which
23      is angled off at a 30 --
24   A.  20 -- 22-degree angle is what it's supposed
25      to be.

Page 50

1   Q.  All right, and the end of the shaft and the
2      tip are painted bright yellow, and there is
3      a warning label affixed in the middle of
4      the shaft prior to the yellow section.
5      Now, it's my understanding that the box end
6      and the tip end are welded onto the shaft.
7      Is that correct?
8   A.  I haven't actually examined the box end,
9      because it wasn't -- it looks -- it
10      certainly is welded --
11   Q.  Huh-huh.  It looks like a weld.
12   A.  Right, all the specifics of the attachment,
13      I'm not aware of, but yes.
14   Q.  Okay, and what type of welding was done --
15      well, since you didn't look at that, that's
16      fair.  For the tip end, how was that
17      welded?
18   A.  The appearance of the weld bead -- I mean,
19      there -- there are basically five separate
20      common welding processes.  There's gas
21      tungsten arc welding; there is gas metal
22      arc welding; there's flux-cored arc
23      welding; there's shielded metalarc welding,
24      and there's submerged arc welding.  There
25      are some other highly specialized like

Page 51

1      electroslag welding, friction stir welding.
2      The bead apparent is consistent with in my
3      opinion more likely than not a wire feed
4      process where you have a -- which would
5      have been gas tungsten arc, gas metal arc.
6      Gas tungsten arc utilizes a tungsten
7      electrode, but there's a wire feed process
8      from the side.  These welds were all
9      rolled.  You can where it starts and stops.
10      So the lead started down here (indicating),
11      the bar was rolled around, and the head was
12      rolled around, and the weld stopped there
13      (indicating).  Probably gas tungsten arc,
14      gas metal arc.  If I'd guess, it would be
15      gas metal arc, possibly flux-cored, but
16      that's a pretty small bead for a flux-cored
17      process.
18   Q.  Well, let me ask you this, you say in the
19      second paragraph on Page 3, "The failed
20      winch bar was assembled for Ancra by Asian
21      Industrial," which is the Chinese company
22      that actually made the bar.  "No
23      information was provided regarding the
24      welding process or the welding procedure
25      used," and I guess my question is, why

Page 52

1      didn't you ask to have that information
2      from Asian Industrial?
3   A.  Ultimately, I mean, I -- I don't know if I
4      specifically asked for it or not.  I would
5      not have objected to having it.
6   Q.  But it was not provided to you by Ancra?
7   A.  That's correct.
8   Q.  And you don't know whether you asked for it
9      or not?
10   A.  I don't recall.
11   Q.  Would it have been helpful?
12   A.  It might have added some additional
13      information.  The primary point is I'm
14      pretty clear that to me it's a process that
15      would be a low hydrogen welding process.
16      The higher welding processes are shielded
17      metal arc and submerged arc welding.  So it
18      might have been nice to know what process
19      was used.  The other information that comes
20      in a welding procedure are voltages,
21      amperages, welding position, joint
22      preparation, whether it's interpass
23      cleaning, those types of things, if there
24      was a preheat involved; if there was a post
25      heat involved.  That information could have

13 (Pages 49 to 52)

Page 53

```
 1    been -- they -- they would go more to
 2    excluding the possibility of hydrogen
 3    cracking rather than helping the
 4    interpretation of the fracture.
 5  Q.  But you were not provided any of that
 6    information, correct?
 7  A.  That's correct.
 8  Q.  And as I understand it, you don't recall
 9    whether you asked to be provided it or not?
10  A.  That's correct.
11  Q.  We've already talked about the warning
12    label, warning on Page 4, and for some
13    reason this is how mine came out
14    (indicating).
15  A.  Yeah, it's small.
16  Q.  You can see a little better.
17  A.  It's -- it's on that drawing.  I believe
18    it's Revision E.
19  Q.  Okay, but can you look at that and tell me
20    whether those warnings are consistent with
21    the ones that you described on the exemplar
22    bar that we have here?
23  A.  There was a change as I understand it based
24    upon the drawing designation revision
25    numbers.  The winch bar that failed would
```

Page 54

```
 1    have likely have had this label
 2    (indicating), which is a little different
 3    than the label that exists today.
 4  Q.  Can you look at this and look at the one
 5    that we have and -- and tell me what
 6    changes were made, how the winch bar that
 7    you had differed from the winch bar that
 8    you're using here as an exemplar.
 9  A.  The biggest difference that I see and I'd
10    have to go back and pull the drawing up so
11    we could actually read it, but this one
12    shows two things (indicating).  This one is
13    in three different languages, and the other
14    thing is is this one has the orientation of
15    the tip; whereas, the original one, which
16    should have been applied to it at the time
17    that that one was manufactured didn't have
18    that information.
19  Q.  So it didn't say use the tip in this
20    fashion or it didn't show a picture?  I'm
21    not understanding what you mean.
22  A.  I'm -- I'm not aware that that information
23    -- I'd have to like I said, read up and
24    look at the label, but I don't --
25          MR. TYNAN:
```

Page 55

```
 1          It didn't -- didn't come out on
 2    his copy.
 3          THE WITNESS:
 4          Right.
 5          MS. WILLIS:
 6          It didn't come out on my copy.
 7    So, I mean, this is what you sent us,
 8    and I couldn't -- when I printed it on
 9    the big printer at the office, it
10    didn't come out.
11          MR. TYNAN:
12          Well, it's on -- it's on the
13    drawing that I -- that I sent you.
14          MS. WILLIS:
15          Yeah, but it's not very legible
16    there either.  Do you have a copy here
17    of the drawing?
18          MR. TYNAN:
19          I'd have to go pull it off my
20    computer and see what I can find.
21          MS. WILLIS:
22          If you could do that, that would
23    -- I need to take a five-minute
24    bathroom break and if we do could do
25    that, that would be great.
```

Page 56

```
 1          (Break in proceedings.)
 2  BY MS. WILLIS:
 3  Q.  If you want to take a minute and compare
 4    these two and what the differences in the
 5    warnings that were on the subject bar.
 6  A.  Clearly the most notable thing that I see
 7    is it doesn't show the orientation of the
 8    bar.
 9  Q.  Nor does it contain any -- any information
10    that the bar should only be used in a
11    single orientation, correct?
12  A.  No.  Other than it has pretty much the same
13    at that one had.  It says, "Caution Do not
14    reach or lean across the bar at any time
15    during operation.  Keep" -- "keep" -- so
16    that part is the same.  "Keep clear of
17    moving winch bar.  It may whip during
18    release of binders."
19  Q.  But insofar as tip oriented up or tip
20    oriented down, it provides no direction on
21    that one?
22  A.  That is correct.
23  Q.  Okay.  Okay.  In Paragraph 3 on Page 3, go
24    back to Page 3, you say, "The handle
25    portion of the assembly was to be produced
```

14 (Pages 53 to 56)

Page 57

1   from Q235 steel," and I was -- I didn't
2   understand that language, "was to be
3   produced." Was it in five -- in fact
4   produced from Q235 steel or do you know?
5   A.  I don't know because we weren't able to do
6   compositional analysis of it.
7   Q.  Okay. Let's go to Page 5. I started
8   asking you this earlier, and I derailed
9   myself I think, but would it make any
10  difference to your opinion in any respect
11  if the facts showed that Mr. Bruce was not
12  finished with tightening down the strap at
13  the time that the bar failed and that
14  another employee came and finished
15  tightening it -- tightening the straps with
16  no incident with a different bar?
17  A.  No. One, I'd have to see the winches,
18  because I don't -- I mean, there's --
19  there's -- I don't know how tight tight
20  was. I -- I mean, without additional
21  information, I mean, if you told me it was
22  perfectly loose, that might be something,
23  but we also don't know if the winch was
24  damaged, could bind the winch, that type of
25  thing.

Page 58

1   Q.  Okay. That was information that would have
2   been useful to you, but you just didn't
3   have it?
4   A.  Certainly if the winch was damaged or if
5   this bar had been used on damaged winches,
6   it could be useful.
7   Q.  And it would also be useful to know exactly
8   how much pressure was being asserted at the
9   time of the failure, right, how -- how
10  tight the straps were?
11  A.  It's -- it's pretty clear what kind of a
12  load was applied to the bar at the time of
13  failure, and so whether it was in -- trying
14  to move the winch or whether it was in
15  tightening the straps, the loads -- it --
16  it takes a certain amount of force to cause
17  a critical claw size about halfway across
18  to propagate on these kinds of materials,
19  and so we can come pretty close to
20  estimating that.
21  Q.  And your estimate is 200 pounds?
22  A.  In the order of 200 pounds depending on
23  where he applied the load.
24  Q.  Do you know where he applied the load?
25  We've already been through that.

Page 59

1   A.  Right.
2   Q.  Never mind.
3   A.  It --
4   Q.  If you have something that would make it go
5   faster, just chime in.
6   A.  Well, all I was going to say and 200 pounds
7   depending on where you apply the load
8   actually approaches the working load limit
9   of the tie down strap and the winch.
10  Q.  What's the working load limit for the bar
11  if it doesn't have any cracks?
12  A.  I didn't look at that value. Well in
13  excess of the working load limit of the
14  straps and the winch.
15  Q.  How do you know that? I'm just asking --
16  A.  Oh.
17  Q.  -- because you said you didn't look at it.
18  A.  I didn't look at a maximum.
19  Q.  Okay.
20  A.  And you'd have to say what kind of failure
21  mechanism occurred.
22  Q.  Okay. Let's look at Page 6. In paragraph
23  -- the second paragraph under, "Visual
24  Examination," you say, "The warning and bar
25  code labels were completely absent. If the

Page 60

1   labels had been lost through wear, it is
2   expected portions of the labels would
3   remain. The complete absence of any
4   remnants of the warning and bar code labels
5   suggests they may have been removed." Tell
6   me the basis for that statement.
7   A.  Well one, I tried to remove the label from
8   one of the exemplars that I had, and they
9   don't come off in a single piece very easy.
10  My experience in working with tools in
11  power plant situations, other industrial
12  applications if it was just wear and tear,
13  I would have expected to see scraping
14  across the marking. You may end up with a
15  little residual parts. I examined the bar,
16  and I saw no residual of the label.
17  Q.  What weather conditions was this bar used
18  in? Do you know?
19  A.  According to Mr. Bruce's testimony, when he
20  was not using it to tighten down the web
21  straps, it was kept in his truck in a bay
22  underneath his bed.
23  Q.  That's storage. I was asking about use.
24  Do you know what conditions it was being
25  used in?

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 61

1   A.  Not specifically.
2   Q.  Do you know what kind of adhesive was used
3       to affix the label?
4   A.  All the data says is it's a pressure
5       sensitive adhesive.
6   Q.  Okay.  So this is just what you think.  You
7       think that the labels were removed because
8       you didn't see any -- and I'm quoting, "any
9       remnants of the warning"?
10  A.  Basically I looked to see if there were any
11      remnants anywhere of either the bar code
12      and the label, and there is nothing
13      present.
14  Q.  Right.
15  A.  No residual.
16  Q.  But you have no evidence that it was
17      removed other than your supposition related
18      to the fact that there was no residual?
19  A.  Other than the fact that I've removed
20      labels from plastic bottles from other
21      components sometime when I'm done with
22      them, and they're very difficult to get
23      off, and I tried to remove this one.
24  Q.  But this one is brand new, right, and the
25      other one was four years old at the time

Page 62

1       that you had it?  The subject bar was
2       manufactured in 2013.
3   A.  Right, and the -- the failure I believe
4       occurred in May of 2016 --
5   Q.  '16.
6   A.  -- yes.
7   Q.  And when you got it, there were no labels
8       on it, correct?
9   A.  That's correct.
10  Q.  And so you have surmised that they were
11      removed?
12  A.  Somebody removed them, yes.
13  Q.  But you don't have any testimony or
14      evidence other than your belief that
15      something would have been left?
16  A.  That's correct.
17  Q.  Okay.  You say, "Mechanical damage observed
18      on the box end of Mr. Bruce's winch bar
19      documents its improper use."  Explain that
20      to me, and if you need to refer to the
21      photos, do.
22  A.  Okay.  So if we look at Photographs 12 --
23      Figures 12, 13, and 14, in particular 12
24      and 13 show brinelling on -- and I don't
25      know exactly what to refer to the -- it

Page 63

1       will have to show in the record just based
2       on the figures, it's consistent with
3       something being leveraged into the box
4       handle as shown in Figure 14.
5   Q.  Brinelling could also be caused by just
6       being thrown into the truck, right?
7   A.  It would be difficult to hit it on the edge
8       like that and in a method that corresponds
9       and matches the lines up.  You might accept
10      -- expect to see to the sides something
11      like is in 11, but that damage is more
12      consistent with something being leveraged
13      through the part like that.
14  Q.  Do you have any evidence that anything was
15      ever leveraged through the part?
16  A.  Other than the witness marks.
17  Q.  What do you mean by "witness marks"?
18  A.  The brinelling.
19  Q.  So just to boil it down to a lay person's
20      view of this, it has dents in it.  So you
21      believe that shows that a cheater bar was
22      used?
23  A.  I don't know what they did to do it.  What
24      I'm suggesting is a bar or something, a
25      lever, a handle of some sort was put

Page 64

1       through the boxed end similar to what is
2       shown in Figure 14, those two marks, and
3       that's not how that end is intended to be
4       used.
5   Q.  But the box end didn't fail, right?
6   A.  No.
7   Q.  So what, if anything, does that have to do
8       with the failure mechanism in this case?
9   A.  Well, that could have been a bar used to
10      apply increased load to the winch, which
11      could initiate a fatigue crack on the tip,
12      and more importantly it shows that the
13      device may have been used by somebody in a
14      manner in which it was not intended.
15  Q.  But you're telling me this could have
16      happened, this could have happened, and
17      this could have happened, but you don't
18      know that that was ever done, that it was
19      used to apply additional force on the
20      winch?
21  A.  I don't know that the application of the
22      force in this -- shown in Figure 14
23      directly resulted in the failure of the
24      tip.
25  Q.  You don't even know that it had anything to

16 (Pages 61 to 64)

Page 65

1     do with the failure of the tip, correct?
2   A. I think that's what I said.
3   Q. All right. You said, "Permanent deflection
4     in the bar was measured over the length of"
5     -- I'm back on Page 6, right, "of the
6     handle using a dial indicator placed on the
7     surface at approximately the center of the
8     bar." What was the purpose of measuring
9     the deflection?
10   A. When I looked at the bar, it appeared that
11     the actual bar has a very slight bow to it,
12     and so I wanted to compare the deflection
13     of the bar over approximately the length of
14     the handle compared to the two exemplars.
15   Q. And what was that?
16   A. Between 60,000ths to 70,000ths. So what I
17     did is I put it on a milling machine table
18     --
19   Q. Okay.
20   A. -- on two -- which is flat on two V blocks,
21     and then I set up the dial indicator in
22     approximately the center, and I say
23     approximately because I compared it at a
24     couple of locations, because I did not
25     remove the label on the center of mine. So

Page 66

1     I did compare it in places where there
2     wasn't a label as well, and as I rotated
3     the failed bar, the dial indicator
4     indicates there's a bow in the bar of about
5     60 to 70,000ths.
6   Q. And what does that tell you, if anything?
7   A. It tells me that the bar may have been
8     loaded sufficiently to bend it, physically
9     deform it.
10   Q. A certain amount of ductility in the
11     materials used to make this bar would be
12     accepted and actually desirable, correct?
13     You'd rather something bend than break?
14   A. Yes.
15   Q. Okay. Let's see. Page 7, what does the
16     fact that the fracture occurred at the
17     point of the weld tell you?
18   A. I don't understand the question.
19   Q. The location of the fracture, what did that
20     tell you?
21   A. It's where the stress was the highest to
22     initiate the fatigue crack.
23   Q. Could this have been prevented by having
24     the weld back an inch or so into the bar?
25   A. That's a hypothetical that I can't know.

Page 67

1   Q. Would that have been a better design and
2     more likely to prevent a failure of the
3     type that occurred here?
4   A. I don't consider that that would be a
5     preferred design.
6   Q. Okay, and you don't know whether or not
7     that would have decreased the likelihood of
8     the failure at the weld site?
9   A. If you applied the proper stresses, a
10     fatigue crack should not have initiated and
11     propagated.
12   Q. I've got it, but I mean, I'm just asking
13     you a common sense question. If you put
14     the weld at the point at which the tip
15     angles off from the bar, wouldn't that be
16     more fragile or less strong or whatever
17     word you want to use than if you put the
18     weld up higher on the bar and you'd have an
19     integrated piece that included both the
20     angled part and the straight part that was
21     then welded onto the bar?
22   A. Without looking at the entire design to
23     make one change, you'd have to probably
24     move the plug weld up farther, the plug
25     weld that attaches the bar. If you moved

Page 68

1     it farther up, now you're going to have to
2     have a bigger tip than you had before. The
3     weight of the bar goes up. It would be
4     like asking what would be different if it
5     was a solid bar. One, it would be a lot
6     heavier.
7   Q. Well, let me ask that question. I'm glad
8     you suggested that. Would it be less
9     likely to develop a fatigue fracture of
10     this kind if it were a solid bar and not
11     welded?
12   A. No, not necessarily.
13   Q. Wouldn't a solid bar be less likely to
14     develop a fatigue fracture at the site that
15     this one did?
16   A. I don't see a correlation between the weld
17     and the fracture characteristics, so I
18     don't see a difference.
19   Q. And I think we've already established that
20     you do not know the type of welding that
21     was used, because you were not provided
22     that information, correct?
23   A. I don't know the specific procedures. It
24     is more likely than not a wire fed process
25     such as gas tungsten or gas metal arc and

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 69

1  very less likely flux-cored arc.
2  Q. But that information was available, but was
3  not provided to you, correct, what type of
4  we weld was used?
5  A. I don't know. I presume it's available.
6  Q. Well, I mean, the company that made the bar
7  obviously would know what kind of weld was
8  used, right?
9  A. You'd have to ask them. I presume so, yes.
10 Q. Is it true that any time steel is heated or
11 cooled that's when it's welded its
12 characteristics can change, the
13 characteristics of the metal?
14 A. That's a very complex question. I'd like
15 to be little more specific. There is a
16 what's known as heat affected zone. It
17 goes through changes adjacent to the weld,
18 that is correct.
19 Q. And that can change the characteristics of
20 the underlying metal in the heat affected
21 zone, correct?
22 A. It modifies the microstructure. I mean,
23 the composition remains the same. Other
24 things remain. So yes, some aspects of it
25 changes.

Page 70

1  Q. Can it affect ductility?
2  A. Depending, yes. I mean, but it can
3  sometime improve it, depending upon the
4  metal.
5  Q. Can it affect hardness?
6  A. Yes.
7  Q. Let's go to Page 11. After the photograph
8  of the dent you say, "the fracture surface"
9  -- this is at the bottom -- "on Mr. Bruce's
10 winch bar was thoroughly documented using
11 stereomicroscopy and a digital microscope."
12 What scanning microscope did you use?
13 A. The scanning electron microscope that I
14 utilized was a Joel, J-o-e-l. I don't
15 remember which specific model it is, but I
16 also tried to put it in the Colorado School
17 of Mines environmental Joel microscope.
18 Q. Where was the Joel microscope that you used
19 located?
20 A. Kilgore Engineering, which is also where
21 the digital microscope is.
22 Q. Those are not pieces of equipment that you
23 have yourself?
24 A. That's correct.
25 Q. How often do you use scanning microscopy?

Page 71

1  A. On average probably about once a month.
2  Q. And you said you had tried to put it into
3  the Colorado School of Mines environmental
4  Joel microscope. Is that right?
5  A. That's correct.
6  Q. Okay.
7  A. It has the largest chamber that I'm aware
8  of in the Denver area.
9  Q. And we'll get to that in a minute. I'm
10 going to ask you this as a narrative
11 question just again to save us some time.
12 Explain to me how the failure occurred, and
13 I'm looking at Page 12, but rather than ask
14 you ten thousand questions or have you read
15 it to me, I just -- I need to understand
16 your opinion of why the bar broke.
17 A. Probably the best thing is to look at
18 Figure 15. The bar was loaded excessively
19 to a point that would have initiated a -- a
20 fatigue fracture along both the inside
21 radius of the bend on the tip and the
22 outside radius of the -- of the bend. That
23 fatigue crack propagated approximately
24 along the inside about a little over a
25 quarter of an inch, and then on the

Page 72

1  outside, I can't read my figure here, but
2  it's probably something closer to an eighth
3  of an inch. The bar was then left for a
4  period of time. That crack existed there.
5  It oxidized more likely than not due to
6  just exposure to the atmosphere, the
7  humidity in the air. Anytime you exceed
8  approximately 50-percent relative humidity,
9  you get some oxidation, and corrosion is
10 what it actually is of the fracture
11 surface, and then at a later time, was
12 used. It again -- those cracks propagated
13 further into where you had approximately 20
14 percent of the cross section remaining, and
15 then the final fracture initiated about mid
16 bar and ran across the ligament that was
17 joining the two fractures.
18 Q. And just to be clear, your opinion is that
19 despite the fact that this occurred at the
20 site of the weld, the weld had nothing to
21 do with the failure?
22 A. I -- I don't see any microstructural
23 correlation between the weld and the
24 failure.
25 Q. So that would be yes, even though it

18 (Pages 69 to 72)

Page 73

1    occurred at the site of the weld, you don't
2    think the weld had anything to do with the
3    failure?
4    A.  I don't -- I don't what that question
5    means.  I mean, the -- the -- the -- I see
6    no correlation between the fact that that
7    -- of that weld, the characteristics of
8    that weld leading to this failure.
9    Q.  But you would agree with me that the
10   fracture occurred at the site of the weld,
11   right?
12   A.  It occurred adjacent to.  We would actually
13   have to look at a cross section to know how
14   close to the weld it occurred.
15   Q.  Tell me the uses that you made of one, the
16   -- the digital microscope and the other,
17   the scanning microscope.  I mean, how did
18   the -- what information did each of them
19   give you and how did they differ from the
20   other?
21   A.  So a digital microscope is still an optical
22   microscope.  It uses light, and it uses
23   optical lenses.  A scanning electron
24   microscope utilizes an electron beam.  The
25   wave length of an electron beam is smaller

Page 74

1    than the wave length of visible light, so
2    you can get higher resolution and
3    magnification potentially than you can, and
4    you generally get greater depth of field,
5    which means if you're looking at a given
6    plane in focus, you can see it over greater
7    depth than you can, but a digital
8    microscope gets around some of that because
9    it steps through and looks at a series of
10   planes and look -- takes the composite
11   image of the in-focus planes to make an
12   image.  So there -- for the magnifications
13   we were looking at, they're similar.  The
14   primary difference is is that optical light
15   reflects off of shiny surfaces so you can
16   see less of the fine details.
17   Q.  And how did you use the scanning microscope
18   in this particular examination?
19   A.  I tried to look at the areas where -- along
20   the edges where the fracture initiated to
21   see what -- see if I could see any
22   indications of a pre-existing flaw or
23   defect.
24   Q.  And what did you find?
25   A.  I didn't see any indications of a

Page 75

1    pre-existing flaw or defect.
2    Q.  Look at Page 23 with me if you would.
3    Figure 28 says that this is a
4    representative electron photomicro --
5    photomicrograph showing the edge and part
6    of the fracture surface, and you say that
7    there are no indications of hydrogen
8    assisted cracking or any other fabrication
9    related imperfections.  This was made with
10   the -- with the Joel microscope?
11   A.  Correct.
12   Q.  Okay.  Is -- I don't use these in my
13   business, so tell me is the camera
14   integrated or you're using a separate
15   camera?
16   A.  There is a detector on the electron
17   microscope that captures the signal and
18   creates an image.  So it's integrated.
19   Q.  Okay, and what is the potential
20   magnification on the Joel microscope?  It's
21   over 10,000, isn't it?
22   A.  It is, however, oxidation on surfaces, the
23   presence of the paint, the organic coating
24   on the surface affects the ability, and
25   also the angle of the -- that you can put

Page 76

1    the samples in.  Often in most failure
2    analysis work, it is my experience that is
3    very, very rarely that you can get up to
4    about 5,000.  Most examinations are done
5    500 to a thousand maximum.
6    Q.  Okay.  You said that this is a
7    representative photo.  Were there others
8    that you made?
9    A.  Yes.
10   Q.  Okay.  I -- I guess I'm your curious as to
11   why you put this one for inclusion in -- in
12   your report.  It shows a magnification of
13   only 25; it's blurry, and it's in black and
14   white.  So why this particular photograph?
15   A.  Well, the area -- the area along the edge
16   is not blurry.  As you get farther away
17   from the sample, you're looking quite a bit
18   further down, and so that's a depth of
19   field issue, but where the fracture would
20   have initiated is on the edge.  I see no
21   markings that would be radial markings
22   extending out of the defect area that would
23   point towards a fracture.  You can
24   typically see those visually with a
25   stereomicroscope.  I don't see any

19 (Pages 73 to 76)

Page 77

1  indication of transgranular cleavage or
2  inner granular fracture. I wanted to show
3  a larger area, so a lower magnification was
4  necessary.
5  Q.  25 is pretty low, though, isn't it? You
6  told me the typical was at least 500.
7  A.  No. I told you up to 500. In most
8  examinations --
9  Q.  Well, I think 500 to a thousand.
10  A.  No. I said maximum.
11  Q.  Okay. Whatever.
12  A.  That typically you start at about 25 to 50,
13  and you look at the overall area, and then
14  you find features of interest, and you say
15  could that be an initiation area, and then
16  you go up on it. I didn't see any at the
17  lower magnification.
18  Q.  Okay, and why is this one in black and
19  white and all the other photos are in
20  color?
21  A.  It's how electron microscopes present the
22  image. They're not using visible light.
23  Q.  Got it. What happened to the other
24  pictures that you took during the
25  examination with the electron --

Page 78

1  A.  I can make them available.
2  Q.  Okay. That would be good. Thank you.
3  Just send them to your counsel, and I'll
4  get them from him.
5  A.  Okay.
6  Q.  Was the radius of the weld of any
7  significance to your analysis? Did you
8  consider that?
9  A.  Which radius?
10  Q.  Look at Page 22. Maybe I need your help
11  explaining this picture. This is the weld,
12  right?
13  A.  That's correct.
14  Q.  Okay. Did it go all the way across the
15  bar? It's holding two pieces together,
16  right? You're welding two pieces together?
17  A.  That's correct.
18  Q.  Did the weld go completely across the bar
19  so that both ends of the bar were
20  completely engaged with the weld?
21  A.  I don't -- don't understand what you're --
22  the -- the weld goes around the bar.
23  Q.  Okay. Did it go all the way around?
24  A.  I didn't see any areas that it did not.
25  Q.  Did you look for that?

Page 79

1  A.  Yes.
2  Q.  Okay. Why didn't this bar simply bend
3  instead of fracturing? It's supposed to
4  have a certain amount of ductility, right?
5  A.  There was a lot of ductility --
6  Q.  Okay.
7  A.  -- which is why failed in a fatigue manner.
8  Fatigue failure are, in fact, a ductile
9  process.
10  Q.  Should it have bent before it broke?
11  A.  That's a function of load that's applied.
12  Q.  Which you believe to be 200 pounds?
13  A.  No. That was at the final failure.
14  Q.  Okay.
15  A.  So to make -- to fracture the 20 percent
16  remaining cross section, it was on that
17  order.
18  Q.  Are you saying that you believe that higher
19  loads were applied at other times?
20  A.  I believe that's likely, yes.
21  Q.  Okay. What do you base that on?
22  A.  The fact that we have a fatigue crack that
23  propagated, and as we discussed before,
24  fatigue growth rates are very
25  characteristic or well known, and if you

Page 80

1  put those into an analysis, it takes a load
2  higher than 20 pounds to propagate -- 200
3  pounds to propagate this crack.
4  Q.  How high?
5  A.  It depends on how big the step is in the
6  fracture. If we looked at the steps -- can
7  I look at your -- your expert's report,
8  show you a photograph? Is this
9  (indicating) it?
10  Q.  No. This is his notes.
11  A.  Okay.
12  Q.  I have it somewhere. Yeah. This is not in
13  color, though.
14  A.  That's all right.
15  Q.  This one isn't. It may be. I don't
16  remember how it --
17  A.  It's okay. Okay. He has got a color
18  version.
19  Q.  Tell me what page, and I'll flip to it.
20  A.  Yeah, I will. So if we look at Figure 5,
21  which is on 10, okay, the distance between
22  the dashed lines --
23  Q.  Huh-huh.
24  A.  -- so he's showing that those are rest
25  marks. If those are a single step, it

20  (Pages 77 to 80)

Page 81

1  would take a considerable load, and again,
2  it's a function of how long of a moment arm
3  you applied, but if you had a 30-inch bar,
4  it might take something on the order of a
5  thousand pounds or more. If you put a
6  longer bar on there, you would apply less
7  force. How much force it takes to grow is
8  a function of how big the step is. So
9  every time you apply a load cycle, you
10 progress the fatigue crack by an
11 incremental amount, and I looked at it a
12 couple of ways. One of the ways that I
13 looked at it is if we looked at a load, if
14 you apply a load of approximately 220
15 pounds out here on the end (indicating) --
16 Q. And just because --
17 A. I'm sorry. Near the box end.
18 Q. Okay.
19 A. -- it would correspond to a strap tension,
20 assuming there's not a bound-up winch or
21 something like that on the order of 5400
22 pounds. If you hold the bar off to the
23 side with you hands spaced like that
24 (indicating), you apply a force of about
25 300 pounds corresponds to again, a load on

Page 82

1  the strap on the order of 5400 pounds. If
2  you look at that, it would take thousands
3  and more likely tens of thousands of cycles
4  at those load conditions to progress the
5  fracture across this fracture surface.
6  Q. Okay. Did you try to determine how many
7     cycles the subject bar had been subjected
8     to?
9  A. At this magnification, that's not possible.
10 Q. Well, let's just do some basic math. It --
11    it was actually later in 2013, but let's
12    say it was manufactured January 1st, 2013,
13    and put in service that day and used until
14    it failed in May of 2016. So that's
15    approximately 40 months, and say he used it
16    every single day.
17 A. Huh-huh.
18 Q. Than there's no way it would have been
19    thousands of cycles, correct?
20 A. That's -- that's right, which leads me to
21    believe that the forces that were applied
22    were much greater than normal forces.
23 Q. Okay, but you have no evidence of that?
24 A. The fracture exists.
25 Q. But other than the fracture and your belief

Page 83

1  that it shows that, you do not have any
2  evidence that excessive forces were applied
3  to this bar by use of a cheater bar or
4  otherwise?
5  A. The fracture is sufficient to show that
6     excessive forces were applied.
7  Q. If we accept your version of how the
8     fracture occurred?
9  A. I -- it's the way the metal works.
10 Q. Okay. I mean, it just seems to me there's
11    an awful lot of speculation here. I mean,
12    you're speculating that a cheater bar was
13    used; you're speculating that the labels
14    were removed; you're speculating that the
15    bar was improperly used, that he was not
16    standing off to the side, but you don't
17    have any direct knowledge of that, do you?
18 A. I can show by virtue of the fracture that
19    loads in excess of the weight, normal
20    weight of an individual or what would be
21    required to exceed the working load limit
22    of the tie straps were applied to this bar
23    or we would not have initiated and
24    propagated a fatigue fracture.
25 Q. We talked about the fact that there's now

Page 84

1  an orientation warning on the exemplar bar
2  that we've been looking at that did not
3  exist on the 2013 bar. Does the position
4  of the tip have anything to do with the
5  fracture anyway?
6  A. Not a significant.
7  Q. Okay.
8  A. It's mostly a matter of an injury warning
9     to an individual.
10 Q. Yeah, because the warning even now doesn't
11    say it will cause it to break. It says it
12    could cause it to rotate and thereby injure
13    you.
14 A. That's correct, and the fracture shows that
15    it was heavily loaded in both directions.
16 Q. But again, the position of this
17    (indicating) -- of this, and I'm pointing
18    to the tip, at the time that it was used
19    would not really have anything to do with
20    the fracture. In your opinion, it's the
21    load forces?
22 A. At the time of the failure the position of
23    the tip did not impact the final failure.
24    We developed a fatigue crack on the other
25    side as well, which says excessive loads

21 (Pages 81 to 84)

Page 85

1  were applied when it was inserted the way
2  the manufacturer now recommends it as well.
3  The way they identified on the bar. They
4  recommended that before. It just wasn't on
5  the label.
6  Q. You saw the specifications for the steel,
7  the standard and alternative steel to be
8  used in the manufacture of this bar?
9  A. Correct.
10 Q. Okay. What's the difference between the
11 standard and the alternative in terms of
12 functionality, if there is any?
13 A. I don't know that there is one.
14 Q. Okay. Is there a difference in the
15 hardness?
16 A. Those designations in and of themselves
17 don't necessarily establish a hardness.
18 You have to specify a hardness, which the
19 drawing does, especially for the optional
20 material.
21 Q. Okay. Did you reach an opinion as to
22 whether this bar was made with the standard
23 or the optional material?
24 A. Without veri -- verifying compositional
25 limits, we can't know with certainty, and

Page 86

1  they are overlapping chemistries.
2  Q. Do you have an opinion as to which one it
3  was?
4  A. I suspect that the hardness would indicate
5  that it is a heat-treated bar.
6  Q. Okay.
7  A. And the microstructure -- the fracture
8  appearance indicates it's a heat-treated
9  bar.
10 Q. Okay. Is that an appropriate material for
11 use of this sort?
12 A. I see nothing inappropriate about it, and
13 in fact, the microstructure of the
14 heat-treated bar would be better than, for
15 example, a hot-finished or cold-finished
16 bar.
17 Q. If you were designing one of these bars,
18 these, and I'm looking at the exemplar,
19 what changes would you make to the design?
20 A. I -- I see nothing -- let me rephrase it.
21 I see nothing wrong with the way it is
22 currently designed.
23 Q. Currently designed meaning today as we sit
24 here or currently designed including the
25 bar that broke?

Page 87

1  A. Given the information I have on the broken
2  bar, I don't see a problem with the way it
3  was designed.
4  Q. And again, you don't think that moving the
5  weld back would have had any effect on the
6  functionality?
7  A. Well, it changes it, but I don't see that
8  moving the weld back would have prevented
9  this failure.
10 Q. And what about having a solid bar?
11 A. Those are a lot of hypotheticals. Now,
12 it's a lot heavier bar. That changes a
13 whole lot of things.
14 Q. Tell me why it's heavier, because, you
15 know, I'm not an engineer; I'm a lawyer,
16 but you've got a -- a steel piece, a steel
17 piece. If it's just all one piece without
18 being welded, why is it heavier?
19 A. Because this tip is solid up to about here
20 (indicating).
21 Q. Huh-huh.
22 A. This is all hollow (indicating).
23 Q. Okay.
24 A. And steel weighs about three-tenths of a
25 pound per cubic inch.

Page 88

1  Q. Got you. All right. What is the function
2  of the box end?
3  A. My understanding is the function of the box
4  end is to release a chain binder.
5  Q. Okay. So this is the chain binder piece,
6  and this is the winch piece (indicating)?
7  A. That's my understanding, correct.
8  Q. And I'm pointing at the --
9  A. Box end.
10 Q. -- box end and the tip end. So you have no
11 difficulty with mechanical qualities of
12 either the standard or alternative steel
13 specifications?
14 A. I don't see that they're an inappropriate
15 material for this application.
16 Q. Give me five minutes.
17     (Break in proceedings.)
18     MS. WILLIS:
19     We're finished.
20     MR. TYNAN:
21     I have a couple of questions.
22     MS. WILLIS:
23     Oh, I'm sorry.
24         EXAMINATION
25 BY MR. TYNAN:

22 (Pages 85 to 88)

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 89

1  Q.  The work you do for utility companies, is
2     -- is that -- that's metallurgical work,
3     though, right?
4  A.  That is correct.
5  Q.  And it's using your skills as a mechan --
6     as a metallurgical engineer?
7  A.  That's correct.
8  Q.  And that would include failure analysis of
9     metals involved in piping or pressure
10    vessels or -- or that sort of thing?
11 A.  Yes, primarily my work is involved in doing
12    failure analysis as well as doing
13    in-service evaluations of components that
14    develop damage in service and helping
15    clients assess whether that damage will
16    progress to failure, when it does, whether
17    replacement or repair would be appropriate.
18 Q.  All from a metallurgical standpoint?
19 A.  That's correct.
20 Q.  Does Investigative Engineering Corporation
21    have any other employees besides you?
22 A.  My wife on a very limited basis, but no
23    technical -- no other technical employees.
24 Q.  Okay, and does your wife have other
25    employment?

Page 90

1  A.  Yes.
2  Q.  She works all day?
3  A.  Yes.
4  Q.  So yesterday morning when I asked you to
5     pack up that -- the subject winch bar,
6     there was nobody there to do it?
7  A.  That's correct.  You know, she's a
8     registrarer at a middle school.
9  Q.  Okay, and this -- looking at Figure 14 of
10    your report on Page 11 where you talk about
11    brin -- brinelling.  Is that correct?
12 A.  Brinelling, huh-huh.
13 Q.  Brinelling, and so you put a Teflon --
14 A.  Bar.
15 Q.  -- bar or rod through there.  When you put
16    that Teflon rod through the box end, did
17    the Teflon rod line up correctly with the
18    brinelling on the top of the box end and
19    the brinelling on the bottom of the bar --
20    box end?
21 A.  Yes.
22 Q.  Of course a Teflon rod would not dent that
23    bar, would it?
24 A.  No.  I used Teflon because I didn't want to
25    modify the -- the --

Page 91

1  Q.  In order to --
2  A.  -- evidence.
3  Q.  -- to put dents in it in the order of what
4     you saw, it would have to be some sort of a
5     hard bar, correct?
6  A.  Yes, most likely another piece of steel.
7  Q.  And when you put a -- and that's commonly
8     known in the field as a cheater bar?
9     MS. WILLIS:
10       Object to the form, but you can
11    answer.
12    THE WITNESS:
13       That would be one possible means,
14    yes.
15 BY MR. TYNAN:
16 Q.  Okay.  So if somebody wanted to apply
17    additional force to that end of the bar,
18    that would -- would that cause an overload
19    on the tip end of the bar?
20 A.  Yes, it certainly could.
21 Q.  And if that was done on -- on a regular or
22    semiregular basis, would that propagate a
23    crack -- crack, a fatigue crack in the area
24    where we see one?
25 A.  Yes.

Page 92

1     MS. WILLIS:
2        Objection as to form, but you can
3     answer.
4     THE WITNESS:
5        It's one means that could account
6     for why we have the fatigue crack
7     propagation, yes.
8  BY MR. TYNAN:
9  Q.  That's all I have.  Thanks.
10    MS. WILLIS:
11       Okay.  The copy of the label that
12    was actually on the exemplar bar, which
13    is labeled, "Winch Bar Drawing No.
14    44394" is going to be No. 4, and Dr.
15    Clark's report will be No. 5.
16    THE WITNESS:
17       And it's Revision E, because they
18    -- they have a later revision that has
19    this label.
20    MS. WILLIS:
21       Okay.  Revision E.  Thank you.  I
22    appreciate that.
23       (Whereupon, the taking of the
24    witness' testimony was concluded.)
25

23 (Pages 89 to 92)

Page 93

1        WITNESS' CERTIFICATE

2

3           I, MARSHAL D. CLARK, Ph.D., P.E., have

4    read or have had the foregoing testimony read to

5    me pursuant to Rule 30(e) of the Federal Rules

6    of Civil Procedure and/or Article 1445 of the

7    Louisiana Code of Civil Procedure and do hereby

8    certify that to the best of my ability and

9    understanding, it is a true and correction

10   transcription of my testimony.

11

12

13   Please check one:

14

15   _____Without corrections

16

17   _____With correction (see errata sheet)

18

19

     WITNESS' SIGNATURE       DATE

20

21

22

23

24

25

---

Page 94

1        C E R T I F I C A T E

2        THIS CERTIFICATION IS VALID ONLY FOR

    A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL

3    SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS

    PAGE.

4

5        I, RAYNEL E. SCHULE, Certified Court

    Reporter, #77005, in good standing, in and for

6    the State of Louisiana, as the officer before

    whom this testimony was taken, do hereby certify

7    that MARSHAL D. CLARK, Ph.D., P.E., after having

    been duly sworn by me upon authority of R.S.

8    37:2554, did testify as hereinbefore set forth

    in the foregoing 92 pages; that this testimony

9    was reported by me in stenotype reporting

    method, was prepared and transcribed by me or

10   under my personal direction and supervision, and

    is a true and correct transcript to the best of

11   my ability and understanding; that the

    transcript has been prepared in compliance with

12   transcript format guidelines required by statute

    or by rules of the Board, that I have acted in

13   compliance with the prohibition on contractual

    relationships, as defined by Louisiana Code of

    Civil Procedure Article 1434 and in rules and

14   advisory opinions of the Board; that I am not of

    counsel, not related to counsel or to the

15   parties herein, nor am I otherwise interested in

    the outcome of this matter.

16

17

18

    Date     Raynel E. Schule, CSR

19          Certified Shorthand Reporter

          State of Louisiana

20

21

22

23

24

25

24  (Pages 93 to 94)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**